UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:25-CR-37-CCB-SJF-2 |
| SHAWN PETTIS | |

## OPINION AND ORDER

Defendant Shawn Pettis is scheduled for sentencing on May 21, 2026. On December 3, 2025, the Court accepted Mr. Pettis's guilty plea as to Counts 1 and 13 of the Indictment charging him with conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and possession of a firearm in furtherance of drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). (ECF 67). The Presentence Investigation Report ("PSR") (ECF 84) was filed on February 13, 2026, along with an Addendum outlining Mr. Pettis's two objections to the PSR (ECF 85). Mr. Pettis disputes the Guideline range calculation in the PSR on two grounds. First, he objects to application of the two-level special offense characteristic enhancement for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance" pursuant to U.S.S.G. § 2D1.1(b)(12) as reflected in Paragraphs 38 and 50 of the PSR. Second, he objects to application of the two-level role-in-the-offense enhancement for being "an organizer, leader, manager, or supervisor in any criminal activity" pursuant to U.S.S.G. § 3B1.1(c).

"A district court need find only, by a preponderance of the evidence, that the facts are sufficient to support an enhancement." *United States v. Prieto*, 85 F.4th 445, 448

(7th Cir. 2023). For the reasons discussed below, the objection to the Section 2D1.1(b)(12) premises enhancement is overruled, and the objection to the Section 3B1.1(c) role-in-the-offense enhancement is sustained.

**PARAGRAPHS 38 & 50—PREMISES ENHANCEMENT**

For purposes of calculating a defendant's Guideline range of imprisonment, U.S.S.G. § 2D1.1(b)(12) directs the Court to add two levels to a defendant's offense level if the defendant—maintained—a premises—for the purpose of manufacturing or distributing a controlled substance. To apply any enhancement, including the premises enhancement, the Court need find only by a preponderance of the evidence that the facts support the enhancement. *United States v. Montgomery*, 114 F.4th 847, 850 (7th Cir. 2024) (citing *United States v. Griffin*, 76 F.4th 724, 751 (7th Cir. 2023); *United States v. Colon*, 919 F.3d 510, 517 (7th Cir. 2019)).

According to Application Note 17 to U.S.S.G. § 2D1.1, a "premises" can be "a building, room, or enclosure." *See also Montgomery*,114 F.4th at 850 (invoking Application Note 17's definition of "premises."). To "maintain" a drug premises, the defendant must exercise control and use the premises "to manufacture, store, or sell drugs . . . "for a sustained period of time." *United States v. Evans*, 826 F.3d 934, 938 (7th Cir. 2016). Mr. Pettis does not dispute that he exercised control over the house where he stored the drugs at issue in this case or that those drugs were part of a drug trafficking enterprise with his co-defendant, Derrick Glass. However, he contends that the evidence of record only establishes that he maintained his house as a drug premises for

2

about six weeks from February 7, 2025, to March 21, 2025, and that six weeks is not a "sustained period of time" sufficient to justify application of the premises enhancement.

Mr. Pettis also cites the following three facts, which seem to relate to (1) whether the house where the drugs were found constituted a "premises," and (2) what the scope of the enterprise was. Mr. Pettis notes that (1) the house was his primary residence, not a separate "stash house;" (2) the money found during the search of the house was "roughly consistent" with personal living expenses, not a large-scale trafficking enterprise; and (3) the limited drug transactions documented by the Government do not establish a "sustained commercial operation." (ECF 89 at 5).

In support, Mr. Pettis relies heavily on *United States v. Montgomery*, 114 F.4th 847 (7th Cir. 2024). In *Montgomery*, the court found that the premises enhancement did not apply to a storage unit where the defendant conducted three drug transactions in a one-month period because an unknown person accessed the storage unit many more times during the same month for an unknown purpose. *Id.* at 851. As Mr. Pettis and the Government agree, "two to three months is the shortest duration of time where [the Seventh Circuit has] approved the enhancement's application." *Id.* For instance, in *United States v. Zamudio*, 18 F.4th 557, 563 (7th Cir. 2021), the court found the premises enhancement appropriate where the defendant had stored methamphetamine in his garage for two to three months before he was arrested. Then in *United States v. Ford*, 22 F.4th 687, 694–95 (7th Cir. 2022), the court affirmed application of the premises enhancement when the defendant had used the rear bedroom of the home where he

3

stayed, rent-free by permission of the person renting the home, for four months to keep drugs and to conduct an unknown number of sales.

Yet as the *Montgomery* court discussed, the premises enhancement inquiry is fact-intensive, and individual circumstances will differ from case to case such that one factor alone, like the duration of the defendant's use of a premises for drug purposes, cannot be determinative. *Montgomery*, 114 F.4th at 851. In fact, the *Montgomery* court declined to decide if maintaining a drug premises for one month was sufficient on its own to justify application of the enhancement based on its analysis of other facts related to the defendant's purpose in using the premises.

Noting the difficulty of defining the boundaries of the drug premises enhancement in U.S.S.G. § 2D1.1(b)(12), the *Ford* court "encourage[d] district courts to focus on how often the defendant used the premises for his drug enterprise, the scope of the enterprise, and the extent to which he controlled access and activities on the premises." *Ford*, 22 F.4th at 695. Therefore, it is possible that use of a premises maintained for the purpose of drug distribution, including storage of a controlled substance for distribution purposes, for less than two months could justify application of the premises enhancement depending on the full range of facts in a particular case.

As to Mr. Pettis, the evidence before the Court shows that Mr. Pettis resided at the house at issue on the dates he admitted to being involved in drug deals alongside Mr. Glass and on the date his house was searched by law enforcement. The evidence suggests that he lived at the house with his teenage daughter, and that cocaine,

firearms, and drug paraphernalia including packaging materials and a scale were found during the search in a bathroom that held only male grooming and personal care products with no other males found in the home or observed coming to or from the house. Mr. Pettis does not challenge these facts.

Mr. Pettis's offense conduct reported in the PSR is consistent with Mr. Glass's statement of the factual basis for his guilty plea stating that "Pettis stored the substances at his home and typically supplied me with them to distribute to others." (ECF 44 at 4). Both Mr. Pettis's and Mr. Glass's PSRs outline drug transactions on February 7, 2025, February 21, 2025, and March 21, 2025, in which Mr. Pettis drove to the buy location from his house. Before driving to the site of the two February deals, Mr. Pettis drove to Mr. Glass's house where Mr. Glass got into Mr. Pettis's car, drove to Mr. Pettis's house, then drove to the buy location where Mr. Glass conducted the deal.

As stated in *Montgomery* and reiterated in Application Note 17 to U.S.S.G. § 2D1.1, "distributing drugs need not be the sole purpose for which [a defendant] maintained the [premises so long as it is] one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Montgomery*, 114 F.4th at 851. The fact that the premises was also used as a primary residence does not prevent application of the enhancement. *Evans*, 926 F.3d at 938. In *Zamudio* for instance, the premises enhancement was found to have been properly applied when a garage was used for drug purposes. 18 F.4th at 563. In *Ford*, the premises enhancement applied when only a rear bedroom was used for drug

5

purposes. 22 F.4th at 694. Mr. Pettis's bathroom seems more comparable to the *Ford* rear bedroom as it appears Mr. Pettis used it primarily or principally to store the drugs, drug paraphernalia, and guns used in his drug distribution enterprise with Mr. Glass.

Additionally, the record shows that Mr. Glass accompanied Mr. Pettis to his house to retrieve drugs to be sold at prearranged buys more than once. Before one of those deals, the buyer expressed concern about the timing of the deal, and Mr. Pettis assured him on a 3-way call that he could meet the scheduled time for the sale, and he did even after taking Mr. Glass to his house to retrieve the drugs.

Even if Mr. Pettis's drug operation with Mr. Glass was not a large-scale trafficking enterprise, as he argues, the facts still show he maintained a premises—his house, or at the very least, the bathroom in his house—to support his illegal drug trafficking activity. And the Pettis-Glass drug distribution enterprise was not a one-time operation. Mr. Pettis even advised the confidential informant buyer on March 21, 2025, that "he could supply [him] with large quantities of heroin or cocaine if needed" (ECF 84 at 8, ¶ 27) showing that he intended to continue the drug trafficking enterprise beyond the last transaction referenced in the PSR. Thus, the enterprise was sustained for <u>at least</u> six weeks. This may be a "'borderline' case closer to the 'outer limits of the enhancement's reach" as discussed in *Zamudio* and *Ford*. *Montgomery*, 114 F.4th at 849 (citing *Ford*, 22 F.4th at 695; *Zamudio*, 18 F.4th at 563). But the totality of the circumstances confirms that Mr. Pettis maintained his house, or at least a bathroom in

his house, for a sustained period as a premises for storing the drugs to facilitate his drug distribution activities with Mr. Glass. *See Evans*, 826 F.3d at 938.

Therefore, the Court finds by a preponderance of the evidence that Mr. Pettis maintained a premises for the purpose of distributing a controlled substance under U.S.S.G. § 2D1.1(b)(12). Accordingly, Mr. Pettis's objection to Paragraphs 38 and 50 of the PSR is **OVERRULED**.

<u>**PARAGRAPHS 39 & 52—AGGRAVATING ROLE IN THE OFFENSE**</u>

U.S.S.G. § 3B1.1(c) directs an increase of two levels in a defendant's offense level "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving less than five participants. Application Note 4 identifies the following factors for the Court to consider when deciding whether the enhancement applies:

- Exercise of decision-making authority,

- Nature of participation in the commission of the offense,

- Recruitment of accomplices,

- Claimed right to a larger share of the fruits of the crime,

- Degree of participation in planning or organizing the offense,

- Nature and scope of the illegal activity, and

- Degree of control and authority exercised over others.

"[N]o one factor is required for the enhancement to apply." *United States v. Barnes*, 141 F.4th 882, 888 (7th Cir. 2025) (citing *United States v. House*, 883 F.3d 720, 724

7

(7th Cir. 2018)). The Court must "make a commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy." *United Sates v. Craft*, 99 F.4th 407, 414 (7th Cir. 2024) (internal quotations omitted). To apply the Section 3B1.1(c) enhancement, some hierarchy among participants must be shown. *United State v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013). But proof that the defendant explicitly gave orders is not required. *Barnes*, 141 F.4th at 888. "Orchestrating or coordinating activities performed by others," *United States v. Martinez*, 520 F.3d 749, 752 (7th Cir. 2008), or "delegating tasks such as delivery or payment," *Barnes*, 141 F.4th at 888 (citing *United States v Sainz-Preciado*, 566 F.3d 708, 714 (7th Cir. 2009)), may be sufficient.

Here, the Government advocates for application of the enhancement arguing that Mr. Pettis exercised control over the conspiracy's cocaine distribution because he controlled access to the substance and the premises where it was stored. The Government defines Mr. Pettis's role in the hierarchy of the conspiracy as cocaine supplier and Mr. Glass's role as cocaine (and firearms) broker. The Government also contends that Mr. Pettis benefitted from the sales made by Mr. Glass pointing to the $400 in pre-recorded buy money recovered from his car during the search of his house. That money was traced to three sales made by Mr. Glass. In fact, $200 of that money derived from the February 27th sale, a transaction during which law enforcement could not conduct surveillance to determine where Mr. Glass and Mr. Pettis went prior to the sale. Lastly, the Government notes Mr. Pettis's statement to the buyer during the March 21st transaction that he could provide larger quantities of heroin or cocaine if needed.

8

Mr. Pettis has not disputed these facts, and they are relevant to the factors in the enhancement analysis. They confirm the nature of Mr. Pettis's participation in the offense as the cocaine supplier and the person controlling Mr. Glass's access to the cocaine he sold. They also confirm that Mr. Pettis did benefit financially from the crimes. They also suggest that Mr. Pettis exercised indirect decision-making authority because no transaction could occur without him deciding to deliver drugs, and a particular quantity of drugs, to Mr. Glass who arranged, led, and transacted the deals.

Yet none of these facts show that Mr. Pettis is involved in recruitment of accomplices. According to the PSR, Mr. Glass and Mr. Pettis participated together in four of the five transactions in February and March transactions. Mr. Glass participated in all five transactions. Five other individuals participated in only the March 5th or March 21st transactions with Mr. Glass. At the March 5th transaction, Josiah McGhee, Dacarri McGhee, and Daqwan Jackson-Burnett were reported present. The PSR only referenced Mr. Pettis as the believed source of ketamine for that sale. Mr. Pettis did participate in the March 21st transaction with Mr. Glass, Dacarri McGhee, Maliek Long, and Joshua Knapp. Beyond his presence at the March 21st transaction, however, nothing in the record connects him to any of the five other participants in the Glass-Pettis enterprise in any way. As a result, there is no evidence that Mr. Pettis recruited any associates into the enterprise. However, Mr. Glass's PSR indicates that he is connected personally to Josiah and Dacarri McGhee; they are his sons. (ECF 72 at 26,

¶ 146). Given that connection, it seems very likely that Mr. Glass recruited associates into the enterprise.

Likewise, the record offers nothing to establish that Mr. Pettis claimed a right to a larger share of the fruits of the crime. The only evidence of what Mr. Pettis took as the result of the enterprise is the amount of money found during the search of his house— $2,380 in a bedroom nightstand and $424 in Mr. Pettis's Ford, which was also driven to the March 21st deal. (ECF 84 at 9–10, ¶¶ 31–32). Only $400 of that money was directly attributable to any of the Glass-Pettis enterprise deals as it was pre-recorded buy money. The five documented deals yielded a gross total of just under $10,000 for both gun and drug sales--$800 for cocaine on February 7th; $1,100 for cocaine and a loaded Ruger, with a sample of methamphetamine/fentanyl, on February 21st; $670 for ketamine on February 27th; $2,475 for 2 firearms with machinegun conversion devices and ketamine on March 5th, plus another $2,000 for two additional guns and $100 to Mr. Glass for brokering the additional gun deal; and $2,800 for cocaine and 3 more firearms on March 21st. (*Id.* at 6–8, ¶¶ 12, 15, 19, 20, 24, 26, 28). On March 5th, Mr. Glass split the $2,000 for the two additional guns between Dacarri McGhee and Jackson-Burnett at the scene. With no further evidence related to Mr. Pettis's share of the criminal proceeds, the only possible inference is that Mr. Pettis did not assert any right to, or actually receive, the larger share of the fruits of the Glass-Pettis enterprise.

Similarly, the facts available support finding that Mr. Glass, not Mr. Pettis, participated more in planning or organizing the deals at the heart of the enterprise. Mr.

10

Glass identified buyers, established meeting locations, divided money, brought in associates or accomplices, and made the associates wait for him before proceeding with the deal. Mr. Pettis stored the drugs that were sold and controlled access to the drugs for deals. He attended most, but not all, of the deals. While the deals would not have occurred without the drugs from Mr. Pettis, Mr. Pettis could not sell the drugs he stored without Mr. Glass planning and organizing the deals.

Additionally, nothing suggests Mr. Pettis played any role in the firearms side of the enterprise even though the drugs were sold in conjunction with the guns. In fact, Josiah McGhee informed the buyer on March 5th, while they were waiting for Mr. Glass to arrive to complete the deal, that he and Dacarri McGhee—again, Mr. Glass's sons—"run this" referring to the gun sale. (*Id.* at 7, ¶ 22). Thus, the scope of Mr. Pettis's illegal activity was limited in ways that Mr. Glass's was not.

The factual basis provided in both Mr. Pettis's and Mr. Glass's plea agreements also support the conclusion that Mr. Glass led the operation. Mr. Pettis told the Court:

> I agreed to help Derrick Glass distribute the controlled substances to others. Mr. Glass would arrange and broker the sales to individuals, and I would accompany or drive Mr. Glass to the sales. I acknowledge that I knowingly and voluntarily involved myself in the conspiracy and that there was interdependence between myself and Mr. Glass in the conspiracy.

(ECF 60 at 4). Mr. Glass's factual basis was identical except that he said: "Pettis stored the substances at his home and typically supplied me with them to distribute to others."

11

(ECF 44 at 4). Mr. Glass took responsibility for the distribution and attributed only the tasks of storing and supplying the drugs to Mr. Pettis.

Supplying drugs is not enough, on its own, to justify application of the enhancement. For example, in *United States v. Miller*, 91 F.3d 1160, 1164 (8th Cir. 1996), the court rejected the organizer/leader enhancement even though the defendant sold drugs and fronted drugs to a known drug dealer in addition to supplying drugs for sale.

In another case, *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994), the enhancement did not apply even though the defendant supplied the drugs and access to the storage facility, decided if the drugs would be sold on credit, and negotiated the sale price. The *Vargas* court said that

> [s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer.

The court then explained that the enhancement may have been justified if the defendant "had been principally responsible for arranging the logistics of the [drug] deliveries or payments, because this would have required him to dictate to some extent, or at least coordinate, the actions of" his co-conspirator and the buyer. *Id.*

More recently, the Seventh Circuit affirmed this standard in *United States v. Colon*, 919 F.3d 510, 518 (7th Cir. 2019) emphasizing that a middleman acting "as a mere conduit in an operation—even one that deals in large quantities of drugs—should not

12

(without more) receive a leadership enhancement." In that case, the enhancement was not applied to the defendant who dealt in large quantities of drugs and occasionally made requests about the terms and locations of drug deliveries. The court "underscore[d] that the application of any enhancement under § 3B1.1 requires a showing that a defendant engaged in affirmative acts of organizing, leading, supervising, or managing that indicate his greater relative culpability in the offense than others involved." *Id.*

The facts here do not clearly show affirmative acts by Mr. Pettis to indicate that he was more culpable than anyone else in the operation, especially Mr. Glass. Mr. Pettis maintained some control over the operations because his schedule dictated when drugs would be available to make any deal. Yet there is no evidence that Mr. Pettis gave direct orders to Mr. Glass, or anyone else, to effectuate the deals. Plus, Mr. Glass identified the buyers and coordinated all the logistics of the deal besides supplying the drugs. Mr. Pettis recruited no buyers and no accomplices. Mr. Pettis did not participate in the firearms part of the enterprise. Mr. Pettis did not demand or receive a disproportionate amount of the proceeds of the operation.

On this record, the Government has not established by a preponderance of the evidence that Mr. Pettis was an organizer, leader, manager, or supervisor of the Glass-Pettis enterprise so as to justify applying the aggravating role-in-the-offense enhancement in U.S.S.G. § 3B1.1(c). Accordingly, Mr. Pettis's objection to Paragraphs 39 and 52 of the PSR is **SUSTAINED**.

## <u>CONCLUSION</u>

Having overruled Mr. Pettis's objection to the premises enhancement under U.S.S.G. § 2D1.1(b)(12) and having sustained Mr. Pettis's objection to the role-in-the-offense enhancement under U.S.S.G. § 3B1.1(c), the Court will apply the premises enhancement and will not apply the role-in-the offense enhancement when calculating Mr. Pettis's Guideline range of imprisonment at his sentencing hearing on May 21, 2026.

SO ORDERED on May 18, 2026.

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT